Case No. 14-1247 et al., Lancaster Symphony Orchestra, Petitioner v. National Labor Relations Board. Ms. Welch for the petitioner, Ms. Sheehy for the respondent. Ms. Welch for the petitioner, Ms. Sheehy for the respondent. Would you like to proceed? I will. Good morning, Your Honors. May it please the Court, my name is Jill Welch and I'm here on behalf of the petitioner, Lancaster Symphony Orchestra. And it's quite an honor to be here. It's taken us quite a while to get here, so I appreciate this opportunity. And I would like to reserve two minutes for rebuttal, if I may. Your Honor, the reason that we're here is, frankly, because the Board in its underlying decision has mischaracterized the incredible evidence, the significant evidence with regard to entrepreneurial opportunity. And in so doing, minimized the control factor, or elevated, rather, the control factors and misapplied its own Board precedent in the performing arts areas when it comes to the independent contractor analysis. So rather than recognize the independent contractor test as it's developed in its own precedence, particularly in the area of the performing arts, the Board elevated a mechanistic application of the right to control factors, essentially backpedaling from its own precedent. And in doing so, mischaracterized the insignificant facts of economic opportunity and didn't recognize, frankly, in the record, a lot of the factors that show the musicians do have control over not only their own circumstances, but over the means and manner in which they perform. Isn't the entrepreneurial opportunity here markedly short of the entrepreneurial opportunity in FedEx? Is there the workers could effectively lease out their roots and could hire their own employees to do their work? So they were, I mean, they were really highly entrepreneurial. Your Honor, in the performing, and I have to say that the FedEx decision and the drivers in FedEx are very different than in the performing arts industry. All right, that's the point. So the entrepreneurial, but in terms of the Board's own precedent, it has found what the factors of entrepreneurial opportunity in the performing arts industry, and I would turn to the dissenting member, Hayes, because he articulated it so well, is the ability for these musicians to go out and to seek other ventures and to determine their income and their economic realities with other entities. Let me ask you to focus on two different aspects of this entrepreneurial activity here, opportunity. As Judge Williams says, in the FedEx case, there was enormous entrepreneurial opportunity for the drivers within the relationship with Federal Express. But here, there doesn't, true, they can work elsewhere and they can get other gigs, but within the relationship with the Lancaster Orchestra, there doesn't seem to be any entrepreneurial opportunity at all. Well, I think that that's not necessarily the case. That's why I was asking you, why not? Right, because the Lancaster Symphony, these musicians have the ability to determine how many sessions that they'll play for. The Board cites its own cases on that, which says that entrepreneurial opportunity is not, that just the fact that they can work more hours is not the same as entrepreneurial activity. They have cases that say that. But there are cases from the Board, too, that go the other way, that show particularly the Pennsylvania Academy of Fine Arts. If we focus on that Board decision, and I guess throughout this we've likened ourselves to models, because the Board found very, very significant in the Pennsylvania Academy of Fine Arts decision that these models had the ability to essentially control their own schedule. And in that case, that equated to the sufficient entrepreneurial opportunity for them to determine their own wages. Okay, so that's one factor you've listed. What are the others that you argue support entrepreneurial opportunities within the relationship? You've mentioned they can work more hours. Right. That's one. One's two. And the musicians have the ability to, again, it's a pay-for-service, so it's a fee-for-service, and I can't dispute that they do get paid per performance. Okay. And they work with a musician's committee. There is also an orchestra committee that gets together to determine how many performances there will be. And that's evidence of entrepreneurial opportunity in their mind? And they're permitted to, within the performance, they're permitted to participate in programs ahead of the performance. They call them conversations with the audience. They get a fee for those performances. But, Ms. Welch, they can't work smarter and earn more money. They can't invest more and earn more money.  They can work more gigs. But they can't actually leverage their know-how or their human capital in a way that expands the compensation they receive for a particular gig. Right. So the time that they spend, quite frankly, the time that they spend engaged in a performance includes not only time that they're actually present at the rehearsal and present for the performances. It includes their rehearsal time on their own, which is determined by them in exclusivity. So you have a better, let's say I'm going to get paid $300 for one concert. Then if I am such a good musician, I only need to practice an hour for that. I'm having an entrepreneurial benefit as compared to someone who has to hack away for 12 hours to be ready for that one. And so that's how I leverage my skill. That's true. That's one way to explain it. If I am engaged in opportunities, if I'm a significant musician and I practice, I can lessen my practice time or I can enhance my practice time. It's any individual business. It's an opportunity cost. So if I focus my time on the Lancaster Symphony Orchestra, it's X hours. Then my time on the other orchestras is an opportunity cost. I think you're getting into trouble, though, when you start to talk about leaving time for other opportunities. I think what we're really, the questions we're asking really focus on, it must be the case that the entrepreneurial opportunity is within the confines of the relationship between these workers and this employer, if you will. Otherwise, then every worker who has moonlighting opportunities left in their schedule becomes an independent contractor. And that is just not, that just doesn't seem like that's what the inquiry is tailored to get at. But I submit to you, Your Honor, that that is exactly what the inquiry is. When you look at the Pennsylvania Academy of Fine Arts case in particular, that is the inquiry when it deals with professionals who are highly skilled musicians in the performing arts industry. But in Pennsylvania Academy of Fine Arts, that's the model case. It is. There you have someone who's coming in with no direction. So there's also the control factor, which we haven't focused on as much. So that case may more be explained by somebody who goes in, who interacts on her own, who's deciding what poses a strike. Whereas here you have people who their breath, their posture, their timber, their bowing is controlled by a conductor. But just going back to the question of entrepreneurial opportunity, if you accept just, and maybe this isn't the way we go, but if you are to accept for purposes of argument that the entrepreneurial opportunity inquiry is focused on within the relationship between these parties, the best I think that we've done this morning is to say, well, maybe you could practice smarter. You take on a season that's all Baroque, and then you could efficiently get ready for each concert. The ones with Lancaster, the ones with Baltimore, the ones with whoever else. Anything else? Right, and so the musicians also have the ability to weigh different jobs and at different prices, and they have the ability to back out of the ones with Lancaster. But that doesn't answer the question about the entrepreneurial activity within the relationship. That's the question. Understood, understood, but I'm saying that within the relationship they have the ability to say to the Lancaster Symphony Orchestra, we have found a higher paying opportunity, and we're going to back out without repercussion. Okay, is that one of your stronger arguments for entrepreneurial activity? I think it's one of the factors that's— Okay, but just to follow up on Judge Pillard's question, what is there other than that they can work more hours? And that they can, for what you say, they can contract for fewer or more concerts, right? Right. Okay, what else? If necessary, they can find a substitute if they need to reach out for these alternative gigs. Wait, they can find a substitute for a concert without the permission of the orchestra? That's right. If they are not able to show up, if there's sickness or something like that— If they're sick, but they can't do what the Federal Express drivers can. Yeah, I think it is very akin to what the Federal Express drivers are doing. Really? In terms of the ability— Federal Express drivers can hire additional people to work for them and to drive more routes. Well, it's different in that way. That's true. Actually, this may be very helpful. Ms. Welch, I am a very experienced violinist, and one of the things I do is I teach a stable of students, and I receive the packet from Lancaster Symphony Orchestra, and I accept all the concerts that they're willing to give me. And then I say, well, you know, I have some students who could really use some orchestral experience. I'm going to subcontract out to those students, and I'm actually going to pay them a third of what Lancaster Symphony Orchestra is paying me, because for them, it's a big step up. So I'm going to basically subcontract out to my students for every one of those performances. Is that something that—and I'm going to receive the pay and give them a third. Is that something that you think is consistent with the contract? The orchestra, quite frankly, doesn't get involved in that. So if there is a substitute and there is any agreement that's reached between the substitute and the performer, that's on their own accord. So you're saying that it's consistent with the record that the musician could do that. Yeah. Where in the record is that? I know that under the agreement, they can skip one of three rehearsals, but I didn't see anything which said that they could get a substitute. Well, they would be asked—in fact, it's affirmative that they were asked to get a substitute if they could, because they didn't want to leave the symphony. They were asked by the orchestra to get a substitute. But could they on their own say, I can't come, here's my substitute trumpet player? I don't think it's projected that way in the record, but I don't think that there's anything that— Well, don't—just tell me whether the record permits that or not. That's all. I guess your answer is it doesn't. There's nothing in the record that says a musician can call up and say, I can't be there today. I'm sending my substitute trumpet player. That is what the record says. The record showed that a musician could call in and say, I can't make a particular program or set of programs, and I think that you would find X a very fine substitute. That's somewhat different from the— I think it's more akin to what you're saying. Do we have anything in the record about whether— That's very different from the Federal Express situation, right? Right. Okay, great. Do we have anything in the record about who gets paid for that, whether the substitute would then get paid directly or whether I would get paid and have to make arrangements to pass that money on to the substitute? Right, there's nothing in the record. Nothing either way. Right, either way. All right. Okay. I wonder, just as a last question, I know this may be—it's our problem more than it's your problem, but do you read our FedEx opinion as announcing a new and different rule from our prior opinions and or as in conflict with the Ninth Circuit's approach, let's say, in Slayman or Alexander? Right. I actually don't—I see it as a recognition of the evolution of the relationship. The FedEx decision basically tracked the board's own evolution, if you will, from the Comedy Store, which was its decision in 1982 where it said the control test has also been viewed by the board as powers to function freely and to work outside of the employer's system and freelance engagements calculated to produce a livelihood. And the cases that were cited in the Comedy Store, an evolution from that point to Corporate Express, where the qualitative evaluation focuses not on the employer's control of the means and manner of the work, but instead upon whether the putative independent contractors have a significant entrepreneurial opportunity for gain or loss. And so in an intervening case in C.C. Eastern and NAVL, leading up to the FedEx decision in 2009, I think it was a recognition of the evolution of the change in the workplace, but also as this board recognized in Comedy Store and in Pennsylvania Academy of Fine Arts, has particular application to the performing arts. So I don't think that there's any conflict known. In fact, this court recognized that there isn't a conflict with its own FedEx approach, which elevates the economic factors with the prior Supreme Court case on the independent contractor test. All right. Thank you. Thank you. We'll hear from the board. Please accord Barbara Sheehy for the National Labor Relations Board. I think we can all agree that the focus of the inquiry should probably rest, it seems like, based on the question on the entrepreneurial opportunity. So I'll start with that. Let me just ask you the same question that I asked Ms. Welch, which is, is that a new rule of law? I thought you argued in your brief that they had failed to raise it timely and shouldn't be able to rely on it. What's your position on whether that's just a degree of emphasis, depending on the facts of the case, or whether there's actually any requirement that we do other than look at all the factors as the particular case, as appropriate to the particular case? Sure. Absolutely. And we tried to make this clear in our brief that it's not the board's position at all that there's been a shift, that the Supreme Court has said definitively when you were reviewing independent contractor status versus employee status, that no factor is decisive. And so the point we were trying to make in the brief is that naturally certain cases, based on their facts, are going to go in various directions. So the test and the importance of the factors tracks the evidence. What do you do with the language in Federal Express which says that entrepreneurial opportunity is, quote, an important animating principle by which to evaluate those factors in cases where some point one way or the other is another way? I'm sorry? I'm reading from Federal Express. Federal Express seems to say that if all of these factors kind of point in different directions, then entrepreneurial opportunity kind of gets a little thumb on the scale. Sure. Isn't that what that says? It does say that, but I think it was significant in that case that the overwhelming weight of the evidence there was in favor of entrepreneurial opportunity. Yeah, I agree with that. So at some point if you have sort of some evidence of all ten factors or you have a tie, for instance, somebody has to be the umpire and make that tie and call the tie going one way or the other. So in that case, this court said we're calling the tie in favor of independent contractor status in that case. Okay. Now what about this case? How does that apply to this case? In this case, I think what you have is, first of all, you don't have the tie. You have an evaluation of all ten factors, and I don't think you see an overwhelming amount of entrepreneurial opportunity counterweighting sort of the control factors here. The board, I think, made very clear that the control factor and the entrepreneurial opportunity factor weigh heavily in favor of finding employee status. So I don't know that you need to look at calling a tie or looking at the animating principles based on the facts. I think the board here found that there is no true, in the sense that this court spoke to in FedEx, there is no true entrepreneurial opportunity within the context, as Judge Pillard was remarking, within the context of the relationship between the musicians. Do you think it's limited to the relationship? Because FedEx looked beyond the relationship, and the board did here, too. The board looked to the fact that they have other gigs, but it said, you know, it didn't say we don't look at that. It said in the entertainment industry, that's just not. Right. Absolutely, and I think that goes. Absolutely. I do think there are, in some circumstances, where it's relevant to look beyond that. But if that were the be-all, end-all, if you were just to look at, can this person reduce the amount of time either in or out of work? You're answering a question I didn't ask. Go ahead. Okay. Well, then I'll stop. You can say what you want. Just don't say it as an answer to a question. What about the board's decisions in Pennsylvania Academy and Boston After Dark? In both of those, the board appeared to put great stress on exactly the fact that counsel stressed here, namely the ability to trade off among the jobs with this firm versus all kinds of other activities. Sure, and in Pennsylvania, the Pennsylvania Academy, the models case. Right. I think that it's significant, as Judge Pillard was pointing out. I think it's significant to remember that there were no aspects of control in that case. So in the absence of a control – I don't think that's true. No, I mean, it seems to me that the board actually recorded the way in which the instructors could direct the models to take particular poses and so forth, and the details of those poses. Right, but I think ultimately the board did also find that there was a lot of discretion in the models themselves in having – There was a lot of discretion in the players themselves in the Lancaster Symphony. With all due respect, the record speaks to that, actually. One of the musicians who's been a musician with the Lancaster – with the symphony for over 30 years was asked directly, what if you felt as if the way you were playing your instrument, the way you wanted to play it with a particular tempo or beat, and you disagreed with the conductor? Framed at that broad level, of course. No, absolutely, but that's the nature of the symphony, quite honestly. It's the conductor that is determining how you will play your instrument, sometimes down as far as the way that you'll play it. No parallel question was asked to the models in Pennsylvania Academy, right? Not that I'm aware of, no. I mean, the other factor that maybe may help understand Pennsylvania Academy is in the Lancaster Symphony context, the musicians are doing the core work of the enterprise. The core of the mission of the symphony. Whereas the model is there as kind of an adjunct to what the drawers or painters or students are doing. Typically work incidental to the core, right? It's going to tip in favor of an independent contractor, you're right, as opposed to employees. So that is a difference. What about Boston After Dark? I believe in Boston After Dark that the subject, the positions in question there, I believe that there was evidence that they hired individuals, which sort of brings them then within the confines of FedEx, that you have very different kinds of entrepreneurial opportunity aspects that you don't have here. I think in Boston After Dark they either contribute material to the publication, just as these people participate in the concert, or they don't. But they don't have any, unlike the Boston After Dark, they don't have Boston After Dark, they don't have the ability to hire anybody. In Boston After Dark, are the contributors hiring sub writers? Yes, I believe so. I believe so. I'm sorry if I'm misstating that, but my notes reflect that Boston After Dark, that one of the components there was that the subject individuals have the ability to hire. And again, I apologize if that's inaccurate, but that's my recollection of the case. I don't think that's correct. Okay. And then I wanted to speak to a couple different things that came up. First of all, to the substitutes, I think to the question of what the relationship is if a musician who's committed to a particular series can't show. The only thing the record says is out of a matter of professional courtesy, that individual, as soon as they know, or hopefully four to six weeks in advance, will notify the symphony they can't show. And they make a commitment to help try to find a substitute. Beyond that, there is no evidence in the record that if I find a substitute, that I profit by that, or that even if I choose not because I'm ill or not because I have a conflict, but because maybe I can leverage my seat, that I can find somebody who's willing to do it cheaper than the symphony is paying me, that somehow I'll recoup that difference. And in fact, logistically speaking, I don't know how that would work. I don't know how you would sneak in to a performance somebody who didn't, who the conductor was unfamiliar with, and then expect that the person who didn't show would get the payment from the Lancaster Symphony Orchestra. So I'm not even sure logistically how that would work, but there's certainly no evidence in the record that there's a proprietary interest of any sort in the seat itself, my ability to play in the orchestra. Let me ask you, Ms. Sheehy, to me, I think one of the things that makes this case feel a little difficult is that it's not a full-time job. It's not even a part-time job. It's kind of the seasonal. I mean, if you think about it, seven-week-long stints spread over half a year, but it could be seven weeks. What if what we were dealing with was Lancaster Humanities Festival, and there was an opera troupe one week, and a Shakespeare theater the next week, and a musical theater the week after that, and an orchestra the week after that, and each of them had artists that were in a parallel position to the musicians here, but were only there for a week. But they came back year after year after year. Would those people be employees? See, I don't know. And if not, why not? Because I think one of the factors here is sort of the expectation, I mean, that the board looks at, right, is the length of the relationship. So once you start taking – if it's a close call, and we can all agree, I think, that the case is sort of a close call, that once you start taking away certain considerations that the board had before it, so here you start taking away this 30-year return of employees. Well, I'm saying I'm not taking that away. I'm saying you come back every year for 30 years, but instead of doing seven-week-long stints, you do a one-week-long. Right. So you're there in a long-term relationship, but I'm just trying to probe at – and maybe this is going back on what some of my earlier questions to Ms. Welsh were suggesting, that the entrepreneurial opportunity has to be within the relationship, because in a way, the fact that this is one facet of a whole career, I'm not sure why, but it does seem to militate against the board's results here. I think what – what is the problem – you're right – is that the nature of this community is it cannot – the symphony cannot sustain, for instance, what, like, the New York Symphony has. So you have the same people, same type of job that perform at the New York Symphony, but they're there night after night in New York, so we wouldn't have any – we wouldn't have, I don't think, the same – or I wouldn't, at least. I don't want to speak – Question about whether that's important. Right. I don't think I would have that. But quite honestly, I can't speak for the board, but honestly, I think if all of the factors were identical and the only thing you changed was that you show up for one week, as a practical matter, all you've described then is part-time employment. Whether that – whether the board would then say, wait a minute, is this sufficiently not enough, like, part-time employment such that there's a different – a way we're going to look at entrepreneurial opportunity when – and the board has never said this, but I do wonder if it could change it. Is that if – does the entrepreneurial opportunity change and are we going to look beyond just within the employment relationship between the putative employer and the putative employee? And as FedEx did, they looked at both. But when you're freeing up 51 weeks, in your example, when you freed up 51 weeks, at that point, could the board then say, you know, normally we look at the relationship between the employer and the employee, but now that there are 51 weeks on the table, maybe that's going to be different. I have no idea how the board would come out on that, but I do think it's a – it's a significant enough twist on it that it would be – it would raise a different sort of question than what we have here. How do you think our standard of review fits into the way we should look at this case? I think under FedEx, what the FedEx court has said is that between two fairly conflicting views, that if the board makes a reasonable choice between those two, that this court will uphold the board. Do you think that's what this case is, or do you think there are not even two reasonably conflicted views? Well, there are certainly two views. And they conflict because we've seen both sides of the – I don't – I mean, I don't – I think one would read the board's decision. You win either way, as she appears. I think reading the board's decision, no, I don't think that there is – there's certainly a conflict. I don't think it's reasonable. As most people know, I think the board makes quite clear that the control factors and the lack of entrepreneurial opportunity doesn't make this, and the board's view hasn't made this case fairly conflicting in terms of the views. The fact that he's dissented, though, I suppose. Okay. All right. Thank you. We'd ask for full enforcement. Let's see. Did Ms. Walsh have any time left? Ms. Walsh did not have any time. Okay. You can take two minutes. Thank you, Your Honor. I really briefly want to focus on the control issue. Before I get there, I do want to say about the fairly conflicting views, they might be conflicting, they might be views, but they're not fairly conflicting. And I think that if you read, Member Hayes' dissent in the case, you'll understand that the board – and I'll get to some of the factors that it didn't even consider on control, the facts, but also misapplied the test. And when we look at the board's decision, it says, nor does the fact that the musicians can work for other orchestras weigh heavily in the favor of finding an independent contractor status. We give little weight to this factor. So this entrepreneurial factor that this court itself has showed the evolution of since the Comedy Store is completely dismissed by the board. And then consideration to the remaining factors. Just to – in the review in FedEx of the evolution of the boards and our thinking, did the court in any place point to these cases involving what amounts to part-time work and an option to opt out as evidence of the increasing significance of entrepreneurial activity? No, but – Or options. Right. But one of the – I don't really recall, but I think one of the factors that the court in FedEx did look to, you know, was whether if they are the regular – if they're part and parcel of the regular business of the provider, right, in that case in FedEx. And they said, well, that might weigh – that might be a factor that we take into consideration, but it's not determinative here, given the overwhelming other instances of economic opportunity. And so I don't know that they necessarily reached out to the performance industry to make the analogy, because there were so many driver cases, quite frankly, that are out there that we are in the minority when it comes to board decisions. So I don't know for a fact that this court reached out to that. But I just wanted to make the point that in the board's decision, factors such as musicians controlling their own instruments, insuring their own instruments, the board basically brushed that under the rug as a non-factor, as well as the fact that they were highly skilled, saying that they point in no clear direction, when in fact under the test they do point in some – in a very important direction. A really hard road on control, because, you know, a lawyer comes to work and she has responsibility for not having a hangover, having a good sleep, being, you know, sharp and having studied well in school. But on the job, these musicians – it's hard to think of a job in which the control is greater. They can't cross their legs. The posture, the breathing, the bowing, and the timbre, the spirit, the volume, the – it's just – whether you smile or not, I mean, I really – it's extremely controlled. So it's very hard for me to see how – and I understand their instruments, but it's very, very hard for me to see how on the job this is not – you don't lose on control. Right. So – and you have to understand how a symphony comes together to perform a piece of music, right? I think I do. And we have to – we have the CC – this court's decision, CC Eastern and NAVL, that speaks to the fact that, you know, inputting and harmonizing the final product is not the end all and be all to determine – Right, but – That's a record in this case. That's a record in this case that the board conveniently cites. The board in its decision, quite frankly, ignored other aspects of the record that I think are telling here in terms of putting the control. And the union's sole witness also testified that there's a lot of interaction between the conductor and the audience, more so than the conductor and the musicians, so that for half of the time that the conductor is present with the musicians, he is not doing that. And one of the important things that's also in the record, as I was rereading it, is the place where these performances occur, which is the Fulton Opera House in Lancaster, is built for a playwright. It is not built for a symphony. So this conductor necessarily needs to tell people to be louder, needs to tell people to come in because of the acoustics of the venue. It's not necessarily that they're controlling the means and manner, right, because that's the individual player who's controlling that. It's the final product that he's controlling. Thank you. Case is – you're out of time, and the case is submitted. Thank you. Thank you, Your Honors. Yeah.
judges: Tatel, Pillard, Williams